[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-16623

_____

D. C. Docket No. 05-00249-CV-FTM-29-SPC

KENNETH R. SCHENA,

Plaintiff-Appellant,

versus

METROPOLITAN LIFE RETIREMENT PLAN FOR
UNITED STATES EMPLOYEES,
METROPOLITAN LIFE INSURANCE COMPANY,
as Plan Administrator of the Metropolitan Life
Retirement Plan for United States Employees,
as the Plan Administrator of the New England
Life Insurance Trust,
d.b.a. New England Life Insurance Company,
NEW ENGLAND LIFE INSURANCE COMPANY RETIREMENT PLAN
AND TRUST,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 29, 2007)**

Before CARNES and WILSON, Circuit Judges, and WALTER,* District Judge.

PER CURIAM:

Kenneth R. Schena appeals the district court's entry of summary judgment against him in his lawsuit against his former employer, Metropolitan Life Insurance Company, and related defendants over the correct amount of his monthly pension. The dispositive question is whether certain written documents Schena received when transferring to MetLife count as official documents of that company's retirement plan under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. For reasons we explain below, we conclude that they do not.

## I.

The material facts are undisputed. In 1982 Schena began working as a sales agent in the Naples, Florida office of New England Life Insurance Company. MetLife acquired New England Life in 1996, but the two companies continued to operate separately during all periods relevant to this litigation.

Two years after the New England Life buyout, MetLife officials and Schena began discussing the possibility of him transferring between the companies, and

---

*Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

during those conversations several MetLife officials told Schena that he would receive credit for all of his years at New England Life for retirement calculation purposes. Schena relied on these assurances when, on December 20, 1998, he signed an "Intra-Company Transfer Memorandum of Understanding," and again in February 1999, when he accepted MetLife's offer to become Agency Manager in its Naples office.

The transfer memorandum, which was the only document Schena signed to initiate his transfer, purported to "set[] forth several important considerations" affecting New England Life agents who wanted to transfer to MetLife. It addressed a long list of topics like transferees' compensation, insurance benefits, and licensing implications, but for present purposes the most important "consideration" was the one addressing Schena's years of service. On this subject, it said that Schena would "be given full credit at MetLife for all of [his] years of New England Life service." That was all it said on the matter. The memorandum also contained a disclaimer, set out in all capital letters and situated just above the signature line, which read:

> I HAVE READ THIS INTRA-COMPANY TRANSFER
> MEMORANDUM OF UNDERSTANDING. I ACKNOWLEDGE
> AND ACCEPT THAT CHANGES (OUTLINED IN GENERAL
> TERMS IN THIS DOCUMENT) WILL APPLY TO ME IF MY
> REQUEST FOR AN INTRA-COMPANY TRANSFER IS

GRANTED BY METLIFE AND NEW ENGLAND LIFE. IF THERE IS ANY CONFLICT BETWEEN INFORMATION PROVIDED IN THIS MEMORANDUM ABOUT METLIFE OR NEW ENGLAND LIFE POLICIES, COMPENSATION ARRANGEMENTS OR BENEFITS, AND ANY PUBLICATIONS ISSUED BY THOSE COMPANIES DESCRIBING THE POLICIES, COMPENSATION ARRANGEMENTS OR PLANS, I UNDERSTAND THAT THE TERMS AND CONDITIONS OUTLINED IN THE PUBLICATIONS ISSUED BY THE COMPANIES WILL BE CONTROLLING, AND WILL NOT BE DEEMED MODIFIED BY ANY INFORMATION SET FORTH IN THIS MEMORANDUM.

The only other document MetLife provided Schena around the time of his transfer covered more or less the same ground. It was entitled "Procedures for Intracompany Transfers," and like the transfer memorandum, it touched on a wide array of topics, including the transfer of an employee's years of service from his former employer to his new one. A chart comparing employment at MetLife and New England Life promised transferees to MetLife that they would "receive full credit for their [New England Life] years of service for purposes of determining eligibility, payments, etc. of certain elements of MetLife's benefit plan." However, it too contained disclaimers. For instance, a note on the last page of the comparison chart pointed out that:

> This comparison is not meant to be a complete analysis of the similarities and differences between the MetLife and New England Life organizations, benefits plans, compensation arrangements and job descriptions. For further information, you should consult with

4

> your management, the MetLife Law Department, Field Compensation Planning and the Human Resources Department for additional details on significant differences between the two organizations.

And a summary at the end of the main text instructed prospective transferees to "take particular care to ensure that they appreciate the impact of the transfer on their benefits and other non-cash compensation" and "[c]ontact your regional office for more information."

The first hint of trouble for Schena came in a letter from MetLife dated December 3, 2001 informing him that he could expect a monthly pension of $919.33—an amount far smaller than the almost $3,000 a month MetLife had estimated in a letter it sent earlier in 2001. The disparity between the two amounts arose because the December 2001 estimate did not give Schena credit for his time at New England Life. In response to the lower figure, Schena began a seven-month-long campaign of faxes, letters, and e-mails to MetLife attempting to secure the pension amount to which he believed he was entitled.

Schena's effort proved unsuccessful. In late July 2002 MetLife's plan administrator wrote to inform him of the company's "final determination" that he was not entitled to the larger pension amount. By this time, Schena had already retired (he did that at the end of May 2002), and due to an earlier-than-planned retirement date, the final estimated pension amount worked out to be only

$492.19. He also received an annuity from New England Life. The bottom line, according to the plan administrator's "final determination" letter, was that the MetLife Plan recognized Schena's New England Life service time for vesting and eligibility purposes, but not for calculating the pension amount.

On the basis of these events, Schena's amended complaint alleged four claims, all of which the district court ultimately deemed unable to survive summary judgment. Here, Schena presses arguments only as to one of these claims—the one asserting that he was entitled to a pension amount based on calculations that gave credit for the years he worked at New England Life. With respect to that claim, the district court concluded that neither of the documents promising Schena full credit for his New England Life service years counted as "plan descriptions, summary plan descriptions, or 'other documents'" under which the plan was established or operated, so that under ERISA there was no basis for his alleged entitlement to the larger pension amount.

## II.

Schena advances two separate, but overlapping, arguments. One is that MetLife's promises of "full credit" for Schena's New England Life service found in the transfer documents he received should be treated as provisions of the MetLife Retirement Plan and enforced, given his reliance on them. The other is

that MetLife's verbal promises of "full credit" during the conversations leading up to his transfer should estop the company from denying him that credit on the basis of its written plan.

The starting point for our analysis is ERISA's express requirement that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), and that requirement's logical corollary that a "retiree's right to . . . benefits . . . can only be found if it is established . . . under the terms of the ERISA-governed benefit plan document," Alday v. Container Corp. of Am., 906 F.2d 660, 665 (11th Cir. 1990) (citing Moore v. Metro. Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988)).

This rigorously enforced rule that we not look outside formal plan documents can have harsh results in some cases, but it serves important purposes. In Moore, the Second Circuit explained the "sound rationale" for the rule:

> Were all communications between an employer and plan beneficiaries to be considered along with the SPDs as establishing the terms of a welfare plan, the plan documents and the SPDs would establish merely a floor for an employer's future obligations. Predictability as to the extent of future obligations would be lost, and, consequently, substantial disincentives for even offering such plans would be created.

856 F.2d at 492.

7

## A.

Here, Schena does not question MetLife's interpretation of its formal, written plan document, which undisputedly denies Schena pension-calculation credit for his New England Life years. Instead, he cites Heffner v. Blue Cross & Blue Shield of Ala., Inc., 443 F.3d 1330 (11th Cir. 2006), where we reiterated the long-standing ERISA principle that a plan participant may enforce the provisions of a contradictory summary plan description so long as he has relied on those provisions. See id. at 1340. We also noted in Heffner that "the [summary plan description] is not the only ERISA plan document that counts," id. at 1341, and held that the group health applications in that case should have been considered because they were part of the contract under which the plan at issue in that case was administered, id. at 1343. Since there is no question that Schena relied on the transfer documents he received from MetLife, he argues that we should treat those documents either as a summary plan description or as other controlling documents and reverse the summary judgment against him.

Unfortunately for Schena, neither of these theories carry the day. First, whether considered separately or collectively, the transfer documents do not qualify as a summary plan description under either of the two approaches we identified in Cotton v. Massachusetts Mutual Life Insurance Co., 402 F.3d 1267

8

(11th Cir. 2005). They do not, because they contain neither: (a) "all or substantially all categories of information required [of summary plan descriptions] under 29 U.S.C. § 1022(b)," id. at 1274 n.8 (quoting <u>Hicks v. Fleming Cos.</u>, 961 F.2d 537, 542 (5th Cir. 1992)), nor (b) "all or substantially all of the information the average participant would deem crucial to a knowledgeable understanding of his benefits under the plan," id. (citing <u>Kochendorfer v. Rockdale Sash & Trim Co.</u>, 653 F. Supp. 612, 615 (N.D. Ill. 1987)). Instead, the documents' treatment of information relating to retirement plan issues is cursory at best.

Not only do the documents fall short of a summary plan description, but they also do not amount to "documents other than the SPD which control the operation of the plan." <u>Heffner</u>, 443 F.3d at 1341. Our decisions have never attempted to set forth a comprehensive description of these other controlling documents, but in <u>Heffner</u>, we looked to the list of documents ERISA requires plan administrators to furnish to plan participants. <u>Id.</u> at 1341–43. That list includes "the latest annual report and the bargaining agreement, trust agreement, contract, or other instruments under which the plan was established or is operated." 29 U.S.C. § 1024(b)(2). The documents here are not of that type. They deal with a wide range of transfer-related topics and only touch on retirement plan issues. They are not contracts or instruments under which the plan "was

9

established or is operated." Id.

Not only that, but the documents in question explicitly discount their own significance. Each contains prominent language warning readers to look elsewhere to determine the precise details of their new benefit programs. One of the documents, the transfer memorandum, even states that the "publications issued by [MetLife] describing the policies, compensation arrangements or plans" control in the event of any conflict between it and them.

For these reasons, we agree with the district court that the transfer documents on which Schena relied do not count for ERISA purposes, either as a summary plan description or as other controlling documents. That means Schena's claim to a larger pension amount cannot be "established . . . under the terms of [an] ERISA-governed benefit plan document." Alday, 906 F.2d at 665.

**B.**

Schena has something of a fallback argument. He says that the verbal promises of MetLife officials should estop the company from denying him the larger pension. Although generally "oral modifications of employee benefit plans are impermissible," Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir. 1986), we have recognized a "very narrow" equitable estoppel doctrine that applies if the

10

plaintiff can show that "(1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity." Jones v. Am. Gen. Life & Acc. Ins. Co., 370 F.3d 1065, 1069 (11th Cir. 2004) (citing Kane v. Aetna Life Ins. Co., 893 F.2d 1283, 1285–86 (11th Cir. 1990)).

The narrow equitable estoppel exception does not help Schena. As he acknowledges in his brief, his argument based on it depends on the transfer documents being considered a part of the MetLife Plan. Otherwise, MetLife's plan is unambiguous. In light of our conclusion that the transfer documents are not part of the Plan, we agree with the district court that "the terms of the Plan were not ambiguous."

**AFFIRMED.**

11